Macomber, J.
This case comes on for a hearing upon the return to a writ of certiorari issued to the respondents, directing them to return unto this court all proceedings taken before the respondents, Jones, Gilbert, Reynolds and Berry, composing a court-martial of the Seventh Division, National Guard of the State of New York, for the trial of the relator upon sundry charges and specifications, and which tribunal convicted him thereon, and sentenced him to be cashiered. The objection is at the outset made by the learned counsel for the respondents, that the writ of certiorari is not properly available to the relator, because he had the right of appeal within a limited time to the commander-in-chief, by section 105 of the military code. But I think that this objection is not tenable, for the same point was made in the case of People ex rel. Garling v. Van Allen (55 N. Y. 31), and was dis *172 regarded by the court. Besides, a motion was made herein at the last August special term, to supersede the writ on this and other grounds, and it was denied by Mr. Justice Dwight upon the merits of the motion. That matter, therefore, is stare decisis.
We come, then, to the merits of the case as disclosed by the proceedings before the court-martial, and as returned by the adjutant-general into this court. There are two charges made against Major Spahn; the first is, that he was guilty of conduct unbecoming an officer and gentleman. The second is, that he was guilty of conduct which was to the prejudice of good order and discipline of the National Guard. There are four specifications under the first charge and five specifications under the second charge. The court-martial convicted the relator upon both charges, and upon each of the several specifications, except specifications two and four of the first charge, the relator’s objections to which were sustained at the trial, and specification five of the second charge, upon which the accused was acquitted.
Without following the charges and specifications in their order, they may all, I think, for the purposes of this review and of presenting the legal questions involved, be grouped into two classes. I put under the first class, specification third of each charge, and all other matters of accusation under the second class.
The third specification of each charge is that the relator did, on November 2, 1879, willfully cause to be printed and published in the Sunday Tribune, a newspaper published at the city of Rochester, alleged to be widely circulated among the officers and privates of the Fifty-fourth Regiment, certain charges and specifications against Colonel S. S. Eddy, and that such charges had not, at the time of the printing thereof, been acted, upon or approved, or made the subject of investigation by any of his superior officers, nor served *173 in any manner upon the said Colonel S. S. Eddy, to the scandal of the military discipline of the State, and against the good order and military discipline of the regiment, and that the same constituted conduct unbecoming an officer and gentleman.
If the relator was in fact guilty of the offense there charged, he, in my judgment, rendered himself clearly liable to be proceeded against according to the laws and regulations of the military service ; for he was acting, in preferring the charges and specifications against Colonel Eddy, strictly as an officer of the National Guard. Causing to be published in a newspaper, in a sensational manner, charges and specifications, before lodging them with the proper officers, would be conduct prejudicial to discipline, and would render the guilty party amenable to punishment. The only question, therefore, under this head, is whether there was any proof that the relator did in fact cause these charges and specifications to be published in the manner alleged. If there was any evidence before the court-martial establishing such to be the fact, or if that court arrived at a conclusion that such fact existed, upon a conflict of evidence, even though this court might upon the same evidence arrive at a different conclusion, I should, under the established practice, decline to review the decision.
But, on the other hand, if there is no legal evidence whatever that the matters contained in such specification are true, the court-martial did not have jurisdiction or power to render its judgment.
The only testimony on this subject was given by Lieutenant-Colonel F. A. Schoeffel, and it is as follows:
“He (the accused) handed me charges and specifications against Colonel S. S. Eddy. Q. State the conversation in full. A. As near as I recollect, he wanted me not to show them to anybody, nor give them to any person until General Briggs got them in his possession. *174 I told him I would do so, and I put them in a drawer and locked them up. Q. When were they taken from ' that, drawer ? A. On Sunday afternoon or Monday afternoon. Q. Did any person have access to them but yourself till Sunday afternoon ? A. No, sir; nobody had access to them. Q. Did you exhibit, or let any one copy or have access to them until Sunday afternoon ? A. No, sir. Q. What did you do with them? A. I gave them to General Briggs, Monday morning or afternoon. Q.. Did you see the Sunday Tribune of November 2, 1879? A. I did, yes sir. Q. State whether you have any knowledge how the charges and specifications came to be so printed. A. I have not. Q. State whether you had any conversation with Major Spahn on the subject afterwards? A. Yes, sir. Q. State it. A. I asked him why he had the charges printed before they were in the hands of General Briggs, or rather, I told him he had no right to have them printed. I told him they were private property, belonged to brigade headquarters, as soon as delivered into my hands. I forget now what he said; I don’t know what the rest of the conversation was.”'
From this it appears that Major Spahn, when expostulated with by Colonel Schoeffel, did in fact make some response ; but the colonel was unable to tell what it was. If it .appeared certainly that the accused made no answer, it is possible that a presumption would arise against him, which, though slight, might tend to the conclusion of a confession of guilt. But there can be no such presumption when that part of the conversation is omitted where his innocence may have been asserted. Major Spahn did not stand mute. He spoke. What he said should have been given, or other evidence of his complicity adduced. It is not enough that a mere suspicion be excited. No prosecuting officer in a criminal trial could, reasonably expect to have the people’s.case, which was so utterly *175 devoid of evidence, submitted to the jury by the court (People v. Bennett, 49 N. Y. 137).
' From this testimony many other inferences and deductions could be drawn, entirely consistent with the innocence of the accused. There is no evidence that Major Spahn retained a copy of the charges and specifications. The conclusion that the premature disclosure of the document is attributed to reportorial and newspaper enterprise on the part of others than the accused, is quite as just and reasonable as the conclusion to which the court arrived, especially when the fact is taken into account that Major Spahn is not shown to have had any business connection with the paper which made the premature publication, and the further fact that he was actually connected with another newspaper, the Democrat and Chronicle, which was published at the same time.
My conclusion, therefore, is, that the court, in convicting the relator upon the third specification of each charge, acted wholly without evidence.
We come now to the second group of specifications under the two charges. These are the first specification of the first charge, and the first, second and fourth specifications of the second charge. These specifications are based upon articles and communications which the accused wrote for the Democrat and Chronicle on September 14,1879, and on March 14, 1880, and another in the form of a letter, written to the Sunday Morning Tribune on December 7, 1879. With the exception of the letter to the Tribune, these productions were written by Major Spahn in his capacity as editor of the military column of the Sunday Democrat and Chronicle. As to the letter to the Tribune, it is sufficient to say that it was what it purported to be, the opinion of a private citizen, in brief, to the effect that the writer was persuaded that, with a different colonel, the Fifty-Fourth Regiment would succeed better ; and that if the *176 colonel was court-martialed and cashiered, it would be better for all parties concerned; and that this seems to have been uttered in answer to an editorial in an evening paper, which had expressed the opinion that no court-martial of Colonel Eddy was necessary or warranted. It appears also in the evidence that this letter was written while smarting under written, but unofficial animadversions, which had been procured by Colonel Eddy to be made to the adjutant-general against Major Spahn. It was a letter written by a citizen upon a matter of public interest, and his right to publish it is secured by section 8, article I. of the Constitution of the State, he being only responsible for the abuse of that right. So much for the second specification of the second charge, in so far as it differs from " the other specifications now under consideration.
I cannot go into the details of these several literary productions ; but they consist of pointed, severe, and, doubtless, sometimes unjust criticisms upon matters connected with the National Guard, and are put together in a manner calculated to attract attention. The following headings, taken from the article of September 14, 1879, there given in small capitals and black type, may be deemed to be a pretty fair and full table of contents: “Our Home Military—An Impending Crisis—The Exodus to Creedmoor—Grumbling—Running Comments on the Late Inspection—A Batch of Spicy Military Wants—How' Rochester is Left in the Cold on Military Appointments—Answers to Correspondents—How and When the Military Becomes Liable to Civilians.”
The character of these publications, beyond the fact that they relate to the National Guard, of which the accused was a member, is of no moment here, for if they be libelous, it is quite clear that the remedy of the injured parties would be in a court of common law jurisdiction, and not in a court-martial. They were *177 written in the capacity of an editor, who had charge of the military column of the Democrat an(L Chronicle, subordinate only to the editor-in-chief; and the question, therefore, is whether these specifications state a military offense. Sections 205 to 211 of the Military Code of the State define the offenses for which officers and soldiers, in time of peace, may be punished. These provisions of the Military Code are accompanied by the general regulations for the military forces of the State, and sections 133, 134 and 135 thereof properly define and explain the meaning of the Code, as follows :
“§ 133, Officers and soldiers will be held amenable to the military law and tribunals for offenses committed while on duty, whether in uniform or not; and they will be deemed to be on duty during the performance of any service which may be lawfully required of them, and while going to and returning from the performance of such service.
“§134. Commissioned officers will also be amenable to the military courts upon charges for unofficerlike conduct, when such conduct has reference to or connection with the military duties, in the discharge of which the accused or the accuser may be or may have been engaged.
“ § 135. Military courts will also exercise jnrisdiction upon the proper charges of unofficer-like conduct. or disrespect to a superior officer when the offense is committed by an officer while wearing his uniform, or any part of it, though he may not be on duty.”
I do not find in these provisions anything to warrant the inference that the military department would seek to overhaul the conduct of a man in his business vocation, even.though a member of the National Guard. The oath which the officer takes is, that he will “faith, fully discharge the duties of the office” to which he is appointed in the National Guard. These duties concern only his official relations to the militia. In the *178 matter of Steinman and Hensel,* the supreme court of Pennsylvania held that persons who were members of the bar, and who were also editors and publishers of a newspaper, could not be proceeded against and disbarred as attorneys for acts which they did not commit as officers of the court, but which were committed by them as editors. Their offense consisted of a gross libel on the court. It was held that they should be proceeded against by indictment or by action, and not in the summary manner adopted by the court of quarter sessions (MS. opinion of Judge Sbcaeswood).
The offense which, as alleged, Major Spahn committed by procuring the premature and sensational publication of the charges against Colonel Eddy, does not appear to be so serious as the other offenses alleged against him ; but it was purely a military offense, properly cognizable by court-martial, while the others, though more serious, if the publications were in truth libelous, are cognizable only by the common Jaw courts, under common law forms and processes. The case before me well illustrates, in its various phases, the rule alike in its departure from and in its return to the true line in which the common law processes can alone run, and to which courts-martial cannot possibly be adjusted. I have already held, that when the relator, as major in the National Guard, preferred charges against Colonel Eddy, and placed them in the hands of Colonel Schoeffel, he was engaged in military matters and acts having reference to military duties. He surely was not then acting as an editor, but as an accuser, invoking the provisions of the Military Code against a brother officer. If the offense of improperly publishing those charges had been proven, the court-martial would have had power and jurisdiction to punish. Bat when he took up his editorial employment on matters disconnected with such charges, he should not *179 have been molested therein by the sword. Otherwise, his military connections would prove too strong for his business rights, and he would be unable to pursue his vocation, and he would become altogether a soldier, and not at all a citizen.
A citizen-soldier is one who, I suppose, earns his daily bread by the labor of his hands or of his brains in business or professions, and not by feats of arms; and who devotes a portion of his time to military training, for its recreations and accomplishments in time of peace, and for its drill and preparation for times of war. This is useful to the State, and is meritorious of the man. When, however, he is not actually engaged in the duties of the National Gruard, or in acts which have connection with military duties, and when not in uniform, he is not amenable to a court-martial
But I think the case needs no further discussion. I will close with this felicitous statement of the general principle, contained in Montesquieiús Spirit of Laws, book 5, chapter 19, third question :
“Thirdly. It may be inquired whether civil and military employment should be conferred on the same person? In republics, I think they should be joined, but in monarchies separated. In the former, it would be extremely dangerous to make the profession of arms a particular state, distinct from that of civil functions; and in the latter, no less dangerous would it be to confer these two employments upon the same person. In republics, a person takes up arms only with a view to defend his country and its laws ; it is because he is a citizen he makes himself for a while a soldier. Were these two states distinct, the person who, under arms, thinks himself a citizen, would soon be made sensible he is only a soldier.”
There are many other questions that, would require serious consideration, had I not arrived at the conclusions as above, upon the merits of the case. Finding, *180 therefore, that there was no evidence to sustain the third specification under either charge, and finding that no legal accusation cognizable by court-martial was made, either under the first specification of the first charge, or under specifications 1, 2 and 4 of the second charge, it follows that the proceedings and sentence must be reversed, and the accused be discharged.

Reported in 22 Alb. Law J. 311.